The next case is Pernell v. Commissioner of the Florida State Board of Education and other appellants and other appellees. Charles Cooper is here for the appellants. Leah Watson and Greg Grubel are here for the appellees. Mr. Cooper, you may begin your argument when you're ready. Thank you very much, Judge Wilson, and good afternoon, Your Honors, and may it please the Court, Charles Cooper for the defendant appellants. This Court has requested the parties to address four pre-split Fifth Circuit cases, and that's a perfectly good place to start. Three of those cases, Your Honors, applied Pickering balancing to uphold a university's decision to terminate the employment of a professor because of the professor's speech. Speech that expressed the professor's personal viewpoints in the classroom. The fourth case, Pred, the first in the series, decided really on the heels of Pickering, didn't resolve the First Amendment dispute between the professor and the university, but it did draw a sharp distinction between the professor's public speech and her in-class expression of personal beliefs, personal viewpoints, and it made clear, and I want to quote, the university's need for discipline within the classroom may well limit the extent or the kind of expression of ideas under the First Amendment's umbrella. These are pretty old cases from the 1960s and 70s, and Garcetti is the seminal government speech case. It's a 2006 case, and I don't really see that any of those old Fifth Circuit cases have factual scenarios that are analogous to this one. McGill, for example, is about tenure. It's not termination, so aren't there more recent law? Bishop versus Aronoff and Garcetti are the cases that we really ought to be taking into consideration in determining whether or not Judge Walker abused his discretion in granting the preliminary injunction in this case. Judge Wilson, I couldn't agree more, but I would say, with respect to these particular cases, applying Pickering balancing and applying what we believe would be the most stringent test that could reasonably be applied in this case, Pickering balancing, that they recognize that the state's interests in the efficient and the effective functioning of its educational institutions and in preserving public confidence in those institutions outweighs any interest that a professor under the First Amendment, academic freedom, could have in that balance to express the professor's personal viewpoints and beliefs, particularly if those personal viewpoints and beliefs do violence to the interests that the state has articulated. What if the professor said that it wasn't their personal belief, it was a fact that they wished to convey to their students? Does the test look any different in that case? Well, the Individual Freedom Act, Your Honor, before you would not reach that. It only reaches espousing, endorsing, promoting any of the eight listed concepts. So if a professor said, and it has a safe harbor for discussion in an objective manner without endorsement of any of the concepts, so it wouldn't reach it. Could the state, consistent with its authorities to prescribe the curricula of its public institutions, take the issue completely off the table? Your Honor, that's not a question before you, but I do believe that the cases would support that if the state did it, but it hasn't done it here. And to come back, Judge Wilson, to your point. This act prevents instructors at Florida universities from expressing their view on the content of the course pertinent to their scholastic field. In other words, a professor could say, I'm in favor, can't say I'm in favor of affirmative action, but can't say, he can say, I'm not against affirmative action, I'm in favor of affirmative action, right? Well, actually, Your Honor, I think it's the opposite. Assuming that affirmative action is captured, and I believe it is, by concept six. And that's based on the content of the course pertinent to their scholastic field, right? Well, Your Honor, the question is who decides whether it's pertinent or relevant. Whether it's the professor, and the professor has some type of academic freedom right to override the university's decision on that, or even the state legislature's ultimate decision on what is relevant, what is pertinent to the course. And, Your Honor, you mentioned Bishop. And that case really squarely addresses precisely that question. The court in Bishop accepted that the professor in that case was articulating his religious viewpoint. Dr. Bishop deviated from the content of the course by discussing his personal views on topics unrelated to the course. That's why Bishop is different, isn't it? No, Your Honor. No, Your Honor. Isn't that what the court held in Bishop v. Aronoff, that he deviated from, he was giving his personal views on matters unrelated to the course he was teaching? Your Honor, the court actually held to the contrary of that. It held that even though the professor believed in his professional judgment, that his personal views were relevant to his coursework, physiology, human physiology, that that wasn't governing. The university could override the professor's judgment about that. Not whether the professor thought it was relevant wasn't the key question. It was whether in a dispute, as the court said, in a dispute over the content of a course offered by the university and taught by a professor, the university must have the final say. Its views must hold sway over the judgment of individual professors. Jack relates not just to, it would apply to law schools as well? Your Honor, it... Or to law schools? The statute only applies to K through 20, so it's not clear that it applies to postgraduate schools. But its principles would certainly apply if it did apply. The Florida WOKE Act also applies to Florida law schools, right? Your Honor, as I understand the application of the statute, it's K through 20. Your year is 15, I guess, right? Because it's kindergarten to 12th grade. Unless you do Montessori, I don't know, or pre-K. Well, I'm sorry. I think it applies then to all of higher education, but certainly it can apply to all of higher education. Correct me if I'm wrong. We are only considering post-high school in this case, correct? That's right. Okay. And do you agree that this law would be unconstitutional if it were applied to private colleges in Florida? Yes, I do. And it is not applied to private colleges, correct? It is not. Those colleges can choose their own course topics and all the rest of it, right? That would be up to them. They are not state actors, Your Honor. And that's why Bishop involves a state actor. That's exactly right. Bishop was a state actor. And in Bishop, really what Bishop is about is about sort of the zenith of the power of the state in terms of saying what a professor can or cannot discuss or engage in classroom instruction because that's really the zenith of the state power since it's a state institution. That's exactly right. Is there any case law that says that the state or the government cannot have a viewpoint? No, Your Honor. In fact, there's case after case after case that makes clear that the state is – when it is the speaker, it can choose what it wants to say, what it will say. That's exactly what Rosenberger said, and Rosenberger really is all the – decides this case just as Bishop does, but it makes clear. And I want to share with you a quote from Rosenberger that really I believe is dispositive, dealing with a university's restriction of student speech. But the court contrasted that with the university's own speech through its faculty. When the state is the speaker, it may make content-based choices. When the university determines the content of the education it provides, it is the university speaking. And we have permitted the government to regulate the content of what is or is not expressed when it is the speaker. The court, two sentences later, made clear that by content, it included viewpoint. Judge Lagoa, it followed from the principle I just quoted, that a holding that the university may not discriminate based upon the viewpoint of private persons whose speech it facilitates does not restrict the university's own speech. So the court in Rosenberger was very clear that a state may have a viewpoint, and that viewpoint – and that it may insist that professors not offer or espouse, I should say, and endorse viewpoints that are contrary to the state's. Do you think that the test under Bishop is the same for in-class curricular speech of a professor and the professor's professional writing or out-of-class lectures? Do you think the state can restrict both or just the one? Well, the state has only restricted here instruction in class. Right, but do you think the state could go further under your view of the law? Well, I think that would depend very much, Your Honor, on whether or not the speech was instructional, whether it was akin to classroom speech. I think it would be a very different question and a harder question, and one that the state hasn't really had to confront, so it doesn't have a position to offer you today. Whether or not, for example, a professor's scholarship would be something that the state could impose these kinds of speech restrictions on, that would be a different question. I think Garcetti, in Part 3, compared the memo, for example, of the assistant DA, whose job it was to provide these type of disposition memos, and why that was pursuant to his duties, with the teacher in Pickering who wrote a letter to the editor, which anyone in the public can do. Now, one doesn't have to be a professor in order to provide scholarship on any particular subject matter. I know this doesn't affect the constitutionality of the act, but can you tell me if anyone has argued, in this case, that there are other restrictions on Florida's ability to restrict professors, say, the contents of tenure agreements or other contractual arrangements? Has that come up in the litigation? Only to my recollection, Your Honor, in the context of the word objective and whether or not that infects the statute because of the safe harbor permitting discussion in an objective matter without endorsement of these concepts, whether or not the existing contractual relationships and regulatory provisions requiring teachers to teach in an objective fashion. That's the only way that I can recall that additional types of restrictions of this ilk have come up in the case. If we accept your argument, we would have to conclude that Garcetti does not have an implicit academic freedom exception. That's right. You would. Well, no. Even though all of the other circuits that have addressed the issue, including Judge Sutton's opinion in the Sixth Circuit, they all say that Garcetti does have an implicit academic freedom exception. Well, Your Honor, actually, I don't read Judge Sutton's decision in Evans to say that. I read it not to reach the question and, in fact, to go farther and to say that academic freedom is an institutional, not an individual professorial privilege or right, Your Honor. But I spoke too soon when I agreed that we lose if Garcetti doesn't apply. I think we win under Bishop, which was decided before Garcetti. I think we win under a proper application of Pickering balancing before you even get to Bishop. As you pointed out yourself, Judge Wilson, it was decided considerably before Bishop and quite a long time before the government speech cases. But Rosenberger itself, Your Honor, as I have indicated a moment ago, before you get to Garcetti, I believe is dispositive of the case. And by the way, Rosenberger, and I'm into my rebuttal, if I may, Judge Wilson, Rosenberger actually provides the central premise of Garcetti. It was Rosenberger that the court quoted, Your Honor, when it said, I want to share this with you. When it said, Your Honor, that restricting speech that owes its existence to a public employee's professional responsibilities simply reflects the exercise of employer control over what the employer itself has commissioned or created. That is the key predicate of the court's decision in Garcetti, and it comes directly from Rosenberger. Thank you. All right. Thank you, Mr. Cooper. Ms. Watson. May it please the Court, I'm Leah Watson on behalf of the Pernell plaintiffs. As its title announces in this court held in Honey Fund, the purpose of the Stop Woke Act is to suppress disfavored speech. Now, that case involved a private corporation and this one a university classroom, but the principles of academic freedom require the same result. The legislature cannot micromanage ideas it disfavors in the classroom. The district court properly enjoined this act for two reasons. First is the prophylactic ban on disfavored speech and cannot survive balancing under Bishop or any of this court's binding precedent. Second, it is hopelessly vague, chilling instruction because professors must guess when they cross an indecipherable line. Now, the state just— The problem, I think, is that here there are a lot of people in Florida who feel very strongly about these topics on both sides, right? From my perspective, though, I have to think about what would happen if there were an issue that almost everyone agreed on, right? I won't go to Hitler because whoever brings up Hitler, I think, generally loses because that's the most obvious one. But if there was a professor arguing for that Stalin was the greatest leader in the history of time, I think that since it's not controversial, people may just write it off. But if it started to become very persuasive to students, I think a lot of parents and Floridians would say, why is our state paying to give these false, objectionable ideas to students? And there are certainly ones more problematic that I don't even want to be up here endorsing, right? I don't want anyone to misinterpret me as somehow saying that these things are good. But why can't the state guide the curriculum in ways that the state thinks are appropriate? And if students don't want to go to a university that is so limited, then they can go somewhere else. Your Honor, what I hear you asking is how do we preserve the sanctity of what is being taught in our university's classrooms? And that is a really important concern. But the issue here is that the university has the right to uphold rigorous academic standards. They always have. And the case is that- This is not- but you're not representing a- you're not representing the University of Miami or a private university. You're representing a state institution that's governed by state law. It receives state funding. It's overseen by the Board of Governors. I mean, it is an inherently state institution. So why can the state not articulate how and what the curriculum should be? Determining the curriculum, the academic freedom is the short answer to your question. Academic freedom protects two things. Autonomous decision making by the academy itself and the uninhibited and free exchange of ideas between teachers. But if that was the case, then Bishop would have been decided the other way. Bishop didn't involve the legislature. This is why Keishian was decided how it was, because in Keishian, the legislature issued- But there would have been academic freedom. Dr. Bishop would have been able to say whatever he wanted to say in his classroom then. Academic freedom doesn't protect professors' rights to say anything they want in the classroom. And we're not talking about their personal views, as my friend on the other side mentioned. Each professor has alleged that their professional views in accordance with their academic standards are limited by the act. And the legislature is removed from the academic judgments of the university. So the line here is that the university can and should and has always maintained academic judgments, academic standards, professionalism. But the legislature cannot. And when the legislature has overreached into the views taught into the classroom in Keishian and also in Sweezy with regard to the lecture that was given, the Supreme Court has said, no, academic freedom protects from government intrusion. And just to continue with the other key principles that we have here, according to the state, university professors have no First Amendment rights at all while they're engaged in classroom instruction. But that's not the case. We saw that in Bishop because there was balancing also in the Fifth Circuit cases. They have rights. Those rights are not unlimited. And they're balanced against the university's interest in effective teaching on a case-by-case basis. The university, as I mentioned, has to uphold non-discriminatory academic standards. The line is that they uphold the academic standards. They have to fulfill the mission of the university. What they cannot do is suppress viewpoints. And that's under Pratt and consistent with how things have been done because, as I mentioned, it's very rare for the legislature to reach so far into the classroom. But when it has happened, the Supreme Court has been clear about the parameters of academic freedom. The professor goes beyond the content of the course. Yes, that is similar to Bishop. And the university has the right to uphold the rigor of their courses just as they did in Bishop. But this act would prevent the professor from commenting on the content of the course. Is that suppressing his views on matters related to the content of the course? It only restricts their personal views if they don't agree with the state. It's not the Anti-Indoctrination Act. It's the Anti-Woke Act. You can compel a spouse, promote ideas all day long, as long as they are the ones that the state agrees with. Have you all explored, to my question to your friend on the other side, whether there may be, apart from whether this law is constitutional or not, whether there may be contractual agreements or tenure-related aspects of these faculty members' speech that would restrict Florida's ability to restrict their speech? That was not the clearest question I've ever asked. Basically, can tenure or other contracts maybe do the work that you are trying to get the Constitution to do here? No. In fact, the state of Florida has copied these same restrictions into the guidelines governing tenure with a five-year review. And so tenure at this point is contingent upon compliance with the South Woke Act. What about for someone who already has tenure? That still applies to them too? Yes. They don't have tenure for the length of tenure. Now it's reviewed on a five-year basis, including for compliance with the South Woke Act. There is no tenure exception to complying with this law or a way that we have seen around through the employee or contractual agreements. Thank you. I also wanted to point out the standard here is that the university can enforce academic standards, and the state doesn't even purport to enforce academic standards. The purpose of the Act is only to suppress disfavored views. And this is important because the classroom is peculiarly the marketplace of ideas. It is where you go to debate, critique, and discuss contradictory views. Really quickly, I see my time is running down, so I'd like to address how we meet the three requirements of Bishop. In Bishop, this court outlined a test for restricting a professor's in-class instruction. It requires balancing on a case-by-case basis of three factors. The strong predilection for academic freedom, the state's interest, and the context. Academic freedom, we've talked about the free exchange of ideas and decision-making of the academy. Neither of them is possible under the Act. Here, the state's interest is minimal because, as you mentioned, Judge Wilson, Bishop involved content-based discrimination. Professor Bishop was teaching religion in an exercise physiology course, and this court held that the university would have restricted his instruction on religion, no matter if it was Christian or no matter the case. It didn't matter that it was Christian. Here, the law is restricting the viewpoints that professors can take in class. And as this court recognized in Honeybun, the state has no compelling interest in a per se rule that speech is discriminatory or offensive. And then finally, this Act is a prophylactic ban to suppress the speech of thousands of professors, and it chills speech before it happens, without regard to its relevance to approved courses or its necessity to meet academic standards. Let's say that conspiracy theories were taking hold, and there were a group of professors who were teaching that the moon landing never happened, or that 9-11 was an inside job. Is there nothing in your view that the Florida legislature could do about that? That would be within the province of the university, first and foremost. If you think of the most extreme scenario, and the legislature took action, it would be subject to Bishop balancing. But because it is a prophylactic ban on speech, that contextual factor would not be very strong. And so it really is the province of the university, and academic freedom has protected universities from governmental intrusion. So you don't think the legislature could get involved in that scenario? I think that it would have to survive Bishop balancing. If that were happening, and conspiracy theorists had taken over universities, then this court could conduct the Bishop balancing and determine. But as a general matter, presumptively, academic standards are enforced by the universities. And then if I may, I just wanted to respond to the last arguments that my friend Mr. Cooper made about Rosenberger, quoting the language that when it's the university speaking, they can engage in viewpoint discrimination. And the plaintiffs don't dispute that at all. What is clear is that classroom instruction is not the university speaking, is not government speech. And Mr. Cooper invites you to read Garcetti as an endorsement of Rosenberger, but the court in Garcetti was clear that consideration of additional constitutional interest would be necessary to determine the First Amendment's treatment of scholarship and teaching. You can't read the dicta from Rosenberger to overrule Garcetti, which was, to supersede Garcetti, which was issued 11 years later. Garcetti was clear. Also, the state invites you to apply First Amendment government speech principles without actually even alleging that they meet the requirements that the Supreme Court and this court have set for government speech, which is that they have endorsement, history, and control factors. They both allege that the government speech principles apply and then say in their reply brief that the analysis of those principles is inapplicable. So I just want to be clear that consideration of each of these factors confirms that classroom instruction is not government speech. For endorsement, no one understands classroom speech on behalf of a university professor to be on behalf of the government, and that's because the classroom is the marketplace of ideas. If classroom instruction were government speech, the government would be expressing contradictory views, which is what the Supreme Court was worried about in Mattal. And even Chief Judge Pryor said schools do not endorse everything they fail to censor in Keaton. Similarly, for number two, control, the state doesn't maintain direct control over the messages taught in classroom instruction in higher education. The Supreme Court has been clear that this instruction is not based on authoritative selection or a pall of orthodoxy from the government. In fact, the decisions are made by the academy, and the exchange of ideas is independent of the government. And then finally, history. There's a long tradition of independence intrusion by the government in instruction. The classroom instruction is not used to transmit the government's messages, and that's important. In fact, the Supreme Court has said it's of transcendent value to us all. Furthermore, the second, fourth, fifth, sixth, and ninth circuits, all post-Rosenberger, have continued to balance the First Amendment rights of professors while engaged in scholarship and teaching, demonstrating that government speech doesn't apply. And the Supreme Court in Mattal was very clear that the government speech doctrine shouldn't be expanded beyond Walker because of its potential for dangerous misuse to suppress his favorite speech. I see I'm over time, and I appreciate your patience. Ma'am, I'm going to ask one question. Yes, ma'am. Because I just want to understand, the Florida Board of Governors is the body that implements and runs the education system in the state of Florida, correct? Do you know? They oversee the public colleges and universities. And then my understanding is that they have the authority to, quote, adopt regulations to implement particular regulations as it applies to state universities, and that they passed a regulation to adopt this act. Yes, the act required them to do so. Okay. That's the Florida Board of Education? That's the Board of Governors. The Board of Education, I think, is page 12, but the Board of Governors is the higher ed. It's higher ed. And with that said, we ask this court to affirm the preliminary injunction. Thank you. Mr. Grubel, on behalf of the Navoa plaintiffs. Good afternoon. Greg Grubel for Dr. Adriana Navoa and the students of the First Amendment Forums. I just want to pick up on some of the questions regarding the line drawing that needs to be done with this case. And I think it's important to note that this is not a case about what universities can do. This is a case about what the state cannot do. And the state cannot pick winners and losers in the marketplace of ideas. And the college classroom is the marketplace of ideas. That's why the court in Garcetti expressly declined to extend the official duties test to professors' speech related to scholarship or teaching. And I'd note that my friend Mr. Cooper has been citing a piece from Rosenberger that was in Garcetti. But Rosenberger was cited extensively in Garcetti. And that court decided not to extend that test, and for good reason. And that's because of the important interest of academic freedom in our public universities. And that's why the second, fourth, fifth, sixth, and ninth circuits that have taken this question up have all uniformly held that speech related to scholarship or teaching is protected. And ignoring that weight of authority, this law invades the classroom and permits professors to criticize these eight ideas all that they would like. But if a student perceives a professor as advancing one of these ideas, the professor will lose their job, and the university could lose millions of dollars in funding. That is rank viewpoint discrimination that's per se unconstitutional. Because the government doesn't have an interest in creating a blacklist of ideas, this law fails any constitutional level of scrutiny. I'd also like to point out one thing that Mr. Cooper said was that this law, what it's only doing is trying to ensure that professors are not indoctrinating students to believe one of these things. But as I just pointed out, this law does not have a scienter requirement. This law is triggered as soon as a student believes one of these concepts when given professors' views on it, or not even their views on it, but given anything within the course of instruction that would cause them to believe it. So this is like the Keyesian case where the Supreme Court there struck down a regulation by the state that prohibited professors from even advancing or advocating for something as terrible as sedition. But the court there said that even a professor carrying around a copy of the Communist Manifesto could be seen as advocating for sedition of the government or the overthrow of the government. That that was not permitted because the professor had no idea what the line was there between permitted and impermissible conduct. That's why the Wegener doctrine struck down the Keyesian case in the certificate there. And this law even goes further than that. As opposed to simply saying that you cannot advance something, this is saying this is a list of eight ideas. Criticize them all you want, but you cannot advance them at all. And I'd welcome your questions about any line drawing you'd like to make or any other questions. What about the question on is restricting a professor's curricular speech different than respecting a professor's personal scholarship or articles that they research and then submit to different scholarly journals? Why aren't those two different things? Well, the language from Garcetti is speech-related scholarship or teaching. And if you accept Florida's position here, if the public professors have any scholarship that's related to their duties, their job duties, the state of Florida is going to be able to control that. And they're not making the argument here. They're saying you can go do scholarship all you'd like, but there is no limiting principle for what they're arguing for. They're saying we get complete control of public professors even if they're engaging in scholarship outside. I don't think that there is any real limiting principle there. What about the concern I raised with the other council that if there were conspiracy theories taking hold, say at a certain university, and it became incredibly problematic, parents were complaining, et cetera, et cetera, why couldn't Florida take action in that situation? Well, Your Honor, you can't censor your way to freedom. And there are a lot of classes in public universities that teach conspiracy theories so that students can understand the theories behind them and argue against them. That's different than endorsing them, right? I think here they would say that you could teach about these ideas as long as you don't endorse them. Those are the verbs, espouses, promotes, advances, inculcates, or compels. And clearly you can do academic scholarship. The issue is subjecting any student or employee to training or instruction. That espouses, promotes, advances. Inculcates or compels. Obviously if you're going to have, let's talk about one, where you were discussing that a particular member of a particular race or national origin or sex is morally superior, that would not be allowed if you were inculcating or advancing that position in a classroom. Well, I would say, Your Honor, it's phrased in the passive voice. If you look at Section A of the Act, it does not say a professor may not willfully inculcate a student to believe this. It says phrased in the passive voice. If a professor or if a student is exposed to these things, exposed to a professor who is advancing one of these ideas, and that causes the student to believe them, that gives the student a right to sue the university in court. And if they prevail, the professor will be deemed to be a discriminatory harasser. Because this is an amendment to the Florida Educational Equity Act that makes these eight topics per se discriminatory harassment. So it is, instead of trying to enhance the learning environment, this is exposing universities to millions of dollars in potential court fees just for professors teaching things that they've already been teaching for years without complaints from students. Is higher education different because it's not compulsory as opposed to secondary education? That's one of the reasons, yes, Your Honor. I would say the other reason is that students go there expecting to learn and debate ideas with one another. We do not assume that our students' minds need to be coddled. We assume that our students need to be engaged in very rigorous debate with one another. These are adults in class and not children, right? That's right. One problem I'm having is distinguishing between can and should. I think whether Florida can set these restrictions is perhaps different than whether they should. And the can is the question for us, and the should is the question for the legislature, in my view. Why is this a can rather than a should question, in your view? Well, Your Honor, because viewpoint discrimination is per se unconstitutional. And we know that from your opinion in the auto case, recognize that, where a municipality was taking a viewpoint regarding gender conformity. And with here, it's the same thing. The state's just saying, don't worry, students, we've decided these. You do not need to continue to debate them. The state of Florida has determined that these eight ideas may be criticized, but they may not be advanced, even if the purpose of advancing them is to argue against why they are good. I'll say the trouble I'm having is that in both of those other cases, it was the government regulating private parties and telling private parties what they could not say, what ideas they couldn't endorse. Whereas here, it's the government restricting itself, which I think is somewhat different. Well, Your Honor, if you look at the NTU case, that case involved a broad prophylactic ban on protected employee speech. That's exactly what we have here. This is a broad prophylactic ban on speech. And when the government engages in that kind of regulation, it is speech of its own employees, of state-owned employees. It's not private employees. That's right. And the NTU case was dealing with public employees as well. And there's not very many cases dealing with applying NTU to viewpoint discrimination, but there is one. And it's in Third Circuit. It's called Inaugurated Transit Union. That case applied the NTU test to a viewpoint discriminatory masking policy by transit workers. And the court there held that it was unconstitutional because it failed the NTU test. And they analyzed whether viewpoint discrimination, as applied to public employees, would ever be permissible. And the Third Circuit was very skeptical that the government would ever have an interest in telling its public employees, even making them take a viewpoint on these things. And I'd point out that my friend on the other side in the reply brief had said that the Inaugurated Transit Union case is inapplicable here because it wasn't a job duty. But if you look at the first line of that case, it says that the transit union employees were required to wear masks. It was a job duty of theirs. And because of the viewpoint discriminatory aspect of it, it was still held to be unconstitutional. So I think you could look at that to graph on. But I understand the court's concerns here. But I think if you step back from it, it's much more concerning to give the state legislature the power to redefine objectivity, to tell students what to believe. The only way that you get to any of these terrible hypotheticals that the state advances that people will be teaching that the Holocaust never happened or any other kind of conspiracy theories is if the state gets the power to do that. If the state says, here's the conspiracy theory. Don't debate it. Don't talk about it. Just accept our version of the truth. That is something that we have never allowed the government to do, especially in the area of higher education. And that's why this court should affirm the district courts are ruling and leave the preliminary injunction. Thank you. Thank you, Mr. Grubel. Mr. Cooper, you've reserved some time for rebuttal. Yes, Judge Wilson, thank you very much. A few quick points. First, my friends on the plaintiff's side keep suggesting that academic freedom is what they agree can set academic standards, but not academic content and certainly not viewpoint. Your Honor, the cases are legion that the government gets to have a viewpoint. Mattel, in fact, said this. Imposing a requirement of viewpoint neutrality on government speech would be paralyzing. When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The free speech clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture. Neither does it require viewpoint neutrality. Did that case involve higher education? No. No, Your Honor. It isn't, but Rosenberger is on higher education. And as I indicated earlier, clearly I honestly just don't see how it can be read as anything other than the government, the university, and certainly the state legislature, the university's creator and funding source may select, does not need to discriminate when it is the speaker. Could a legislature prohibit professors from saying anything negative about a current gubernatorial administration? Your Honor, it's prohibit them from saying anything in their classrooms or prohibit them outside of their classrooms. In the classroom. Well, I think, Your Honor, yes, because in the classroom, the professor's speech is the government's speech. And the government can restrict professors from, on a content-wide basis, and restrict them from offering viewpoints. In order to say that, in order to accept that, we would have to say that there's no, there's absolutely no academic freedom exception to the government speech doctrine. Well, Your Honor, you wouldn't have to say that for the first time because that's exactly what Bishop said. Your Honor, Bishop quoted from the very cases, Keyesian and cited, at which itself quoted Sweezy, and the Paul of Orthodoxy quote that they repeat many times in their briefing. And it said, and Bishop itself rejected that, it said the pronouncements of the Supreme Court about academic freedom cannot be extrapolated to deny universities command of the content of their own courses. So all the other circuits have it wrong then? Well, Your Honor, there is no case. They have cited none and we have found none that holds that individual professors have a right of academic freedom to override and to contradict the course content choices of their university and certainly not of the state legislature. There's no case to that effect and there are many cases to the contrary of that. Do we have any concern that perhaps we'll start seeing completely different curricula in what we'll call red states versus blue states, that students will be learning entirely different sets of facts and approaches depending on which state they live in if they go to a state university? Your Honor, I suspect that happens quite distinctly now in many respects, but that's the genius of federalism, Your Honor. These are state institutions and the states themselves get to make decisions about the content of the courses taught in their schools. And that includes viewpoints, Your Honor, and to the extent that the plaintiffs and other professors cannot conform themselves to the requirements of the state's curricular commands and requirements, then they can see if there are other states that are friendlier to their viewpoints and to the espousing, inculcating, and endorsing of their viewpoints contrary and in contradiction to the state's own viewpoints in some other place. So the state could go too far such that students were less likely to attend the universities or faculty were less likely to attend or faculty were less likely to want to do their scholarship there. But I guess that would be the state bearing different consequences for its choices rather than a constitutional restriction, right? That's right, Your Honor. But you could also have people who decide to go to the university instead. Well, it could certainly work both ways. The state may decide that there are costs of that kind to its adherence to a particular policy. But I think there's something very instructive from this court's statement in the Meck case, which was that case where the schools hung banners of local entities, sponsored by those local entities, and they removed a tutor, a local tutor's banner, because of the tutor's other activities. And this is what Chief Judge Pryor, in a unanimous opinion, said in the Meck case, M-E-C-H, if I may share this with you. If the banners are government speech, Meck loses. The Free Speech Clause of the First Amendment restricts government regulation of private speech. It does not regulate government speech. When the government exercises the right to speak for itself, it can freely select the views it wants to express. The freedom includes choosing not to speak and speaking through the removal of speech that the government disapproves. Government speech is regulated primarily by the political process, not the Constitution. That speaks, I think, Judge Grant, specifically to your point. Government speech is the political process. If the political price of this law or any law becomes, you know, excruciating for the state's politicians, or the state decides to elect different politicians, and their legislature decides on a different curricular policy and different curricular viewpoints, well then, they'll have every freedom to do so. Thank you. I'm well over my time. Thank you, Your Honor. Thank you, Mr. Cooper. Thank you, Counsel.